(C.D. 2362)

BIRD MACHINE COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 4, 1962)

*Richard J. Walsh* (*Francis E. Silva, Jr.*, and *Charles W. Heard* of counsel) for the plaintiff.

*Joseph D. Guilfoyle*, Acting Assistant Attorney General (*Daniel I. Auster*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; RAO, J., dissenting

LAWRENCE, Judge: Plaintiff brought this action by protest pursuant to the terms of section 514 of the Tariff Act of 1930 (19 U.S.C. § 1514).

Certain machines known as Skardal stock preparators, and parts, were classified by the collector of customs as "Other stock treating parts for paper and pulp machinery," pursuant to the provisions of paragraph 356 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 356), as modified by the trade agreement with Sweden, 68 Treas. Dec. 19, T.D. 47785, or the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of 20 per centum, 19 per centum, 18 per centum, or 17 per centum ad.valorem, depending upon the date of entry.

The various parts to which the entries relate are described in the stipulation referred to, *infra*, with English translations, as one set of stators and rotors, Slapas (shoes), Malrings (cylinders), Rotornavs (spiders), Mellanvagg (separator), Axel (shaft), Ring (spacer), Lagerlock (bearing housing cap), Lasbricka (lockwasher), and Lasmutter (locknut).

Plaintiff concedes that the classification of the Slapas, Malrings, and Rotornavs in entry 22483 and the 18 Slapas and 7 Malrings in entry 10859, as well as the 5 Malrings in entry 5694, were properly classified.

As to the Skardal stock preparators and merchandise other than that specified in the above concession, plaintiff contends that the proper classification should be as "machines for making paper or paper pulp" or parts thereof, as provided in paragraph 372 of said act (19 U.S.C. § 1001, par. 372), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and subjected to duty at the rate of 10 per centum ad valorem, or by the sixth protocol, *supra*, which provides duty at the rate of 9½ per centum, 9 per centum, or 8½ per centum ad valorem, according to the date of entry.

The pertinent text of the statutes involved is here set forth.

Paragraph 356 of the Tariff Act of 1930:

Planing-machine knives, tannery and leather knives, tobacco knives, paper and pulp mill knives, roll bars, bed plates, and all other stock-treating parts for pulp and paper machinery, * * * meat-slicing cutters, * * * 20 per centum ad valorem.

Paragraph 356 of said act, as modified by the trade agreement with Sweden, *supra:*

Planing-machine knives, tannery and leather knives, tobacco knives, paper and pulp mill knives, roll bars, bed plates, and all other stock treating parts for pulp and paper machinery, * * * meat-slicing cutters, * * * ___ 20% ad val.

  NOTE.—The existing customs classification treatment of articles not more specifically provided for than in paragraph 356 or in the last clause of the first sentence of paragraph 352, Tariff Act of 1930, and described in both such provisions of law, as being more specifically provided for in paragraph 356, in accordance with the decision of the United States Customs Court published as Abstract 23625 (63 Treas. Dec. 1417), shall be continued during the effective period of this Agreement.

Paragraph 356 of said act, as modified by the sixth protocol, *supra:*

Roll bars, bed plates, and all
  other stock-treating parts for
  pulp and paper machinery
  (not including paper or pulp
  mill knives) _____ 19% ad val.       18% ad val.       17% ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra:*

Machines, finished or unfinished, not specially provided for:
    Calculating machines * * *

  *         *         *         *         *         *         *
    Machines for making paper pulp or paper_____ 10% ad val.
  *         *         *         *         *         *         *

Paragraph 372 of said act, as modified by the sixth protocol, *supra:*

Machines, finished or unfinished, not specially provided for:
    Adding machines * * *

  *         *         *         *         *         *         *
    Combination candy cutting and wrapping machines; machines for making
      paper or paper pulp; * * *__ 9½% ad val.   9% ad val.   8½% ad val.
  *         *         *         *         *         *         *

At the trial, the case was submitted for decision upon a written stipulation of fact, the testimony of two qualified witnesses, called by plaintiff, illustrative exhibits 1 and 2 (schematic drawings), and exhibit 3, a book entitled "Modern Pulp and Paper Making," 3d edition, 1957, by George S. Witham, Sr., revised by John B. Calkin.

It appears from the stipulation that the so-called Skardal stock preparator, which is illustrated in exhibits A, B, and C, attached to the stipulation, "is an integrated mechanical complex lacking only motive power from an outside source in order to perform the function for which it is designed, namely, the refining of paper slurry from virgin stock, waste paper, etc., by means of a grinding or grating action."

The stipulation further provides that the machine performs a refining process in three stages, characterized by the fact that drill holes

in the shoes and cylinders are smaller in the second stage than in the first stage and still smaller in the third stage than in the second. Depending upon the stock to be treated and the end result desired, cylinders and shoes with larger or smaller perforations may be substituted, and the working angle between the shoes and cylinders modified by the substitution of spiders of varying dimensions.

Paragraph 7 of the stipulation describes the functions of the machine in the following terms:

* * * The stock enters through the inlet port into the first stage where it is beaten and ground between the rotating shoes and inner surface of the stationary cylinder until it has been sufficiently refined to pass through the perforations in the cylinder (See Exhibit B). It then flows into the second stage where the same process is repeated, the slurry becoming further beaten and ground and thus refined. It then passes through the perforations in the second cylinder into the third stage and after further beating and grinding leaves the machine through the perforations in the third cylinder and then the exhaust port. The function performed by the machine is the refinement of the stock fed to the machine, the process involved being that of making the fibres of the paper slurry shorter and finer by beating and grinding.

Plaintiff's first witness, George L. Nelson, a highly trained and experienced mechanical engineer, and who was well informed in the business of pulp and paper manufacture, testified at length with regard to the nature and functioning of machinery employed in the conversion of raw material or stock, such as logs, or waste paper into pulp and paper. His testimony corroborates the recital of facts set forth in the stipulation in greater detail.

Through the witness Nelson, plaintiff's illustrative exhibit 1, described as a "Typical Kraft Pulp Flow Diagram Screens & Refiner before Washers," and illustrative exhibit 2, a flow diagram, illustrating the use of the Skardal preparator, "as used in Making of Paper Pulp at Chesapeake Corp., West Point, Va.," were received in evidence.

Illustrative exhibit 1 is a graphic picture of the testimony of Nelson who, in response to the question on direct examination to "* * * describe the whole process, of which the Skardal plays a part on this particular chart," stated—

This is called a typical graph [sic] pulp-flow diagram. There are an infinite number of variations, but as shown here wood logs, generally four feet in length, arrive at the pulp mill, and the first part of the process is to go through a barking drum, which resembles a tumbler, to remove the bark. These logs are then washed and are then made into chips by a very powerful set of rotating knives. These chips are then conveyed to a digester into which are added chemicals and steam pressure where cooking takes place. This is a batch process, generally, in the digester, and flows from the digester into what is commonly called a blow tank. From the blow tank the first separation is made as shown here in this example by the Jonsson Screen. The Jonsson Screen separates the—it's a coarse separation, separates knots, uncooked chips, slabs, and the like, from the usual run of pulp. Following along, then, the deknotted pulp, the pulp from which the

knots have been removed—this pulp enters a fine screen where a final separation is made on the basis of size. Then this screened pulp enters, generally, really a three or four-stage washer system, from which the cooking liquors are removed. And then the washed pulp is generally sent to a storage chest from which it later goes to the paper mill for the manufacture of paper. Now, the separation which has been obtained in both the Jonsson Screen, as here noted, and the fine screen can be, as shown in this diagram, sent to a Skardal Preparator where it is reduced in size through the use of power, and again, as shown in this diagram, be returned to the system at the blow tank. Then from the blow tank it goes through the remaining screens that I have already described. It will be refined so that the pieces which have not been reduced enough in the Skardal once again would be sent through.

When asked at what point the material becomes pulp, the witness replied—

Well, the final product in the storage chest. I would consider this is the output of the pulp mill. I would say that the pulp is now in condition for further use when it reaches the storage chest.

The Jonsson screen, identified on illustrative exhibit 1 and referred to in Nelson's testimony, is not involved in this case but is the subject of decision in a companion case decided concurrently herewith. *Bird Machine Company* v. *United States* (protests 61/10981, etc.), 49 Cust. Ct. 81, C.D. 2363.

It was agreed between adversary counsel that plaintiff's second witness, Sven Fahlgren, also a well-informed and experienced technical advisor, would give substantially the same testimony as was given by Nelson.

As stated earlier in this opinion, it is agreed between the parties that the Skardal stock preparator "* * * is an integrated mechanical complex lacking only motive power from an outside source in order to perform the function for which it is designed, namely, the refining of paper slurry from virgin stock, waste paper, etc., by means of a grinding or grating action." Furthermore, "* * * the machine consists of a series of three perforated cylinders against each of which the stock is ground or beaten by three perforated shoes. The other parts are the base, housing, inlet and exhaust ports, shaft, spiders to which the shoes are connected, sheave for belt for transmission of power from an outside source, and miscellaneous smaller parts."

With the material facts of the case not in dispute, the issue before us resolves itself into a question of law—Is the Skardal stock preparator, together with other articles accompanying it in the importation, properly classifiable as "stock treating parts for paper and pulp machinery" or as "machines for making paper or paper pulp" or parts thereof?

At the opening of the trial, plaintiff stated that the basic question involved herein is whether the Skardal stock preparator briefly described as a machine "* * * for taking material and refining it, that

is in the sense of making fiber smaller and more usable so that they may be used later on in the process of making paper pulp or in making paper, is a machine" for making paper pulp, as distinguished from paper. Furthermore, plaintiff contended, in substance, that since the Skardal is a machine it cannot be part of machinery, within the purview of paragraph 356.

It is the considered opinion of the court that the word "parts" in the phrase "stock treating parts for paper and pulp machinery" is employed in the tariff sense of the word that a "part" of an article is an integral, constituent, or component part thereof, something necessary to the completion of and without which the completed machinery could not function. *United States* v. *Willoughby Camera Stores, Inc.* (1933), 21 C.C.P.A. (Customs) 322, T.D. 46851.

The language in paragraph 356, with which we are concerned, is readily susceptible to the meaning that it embraces not only stock treating elements or parts but as well machines which operate together or in sequence in the process of treating stock for pulp and paper machinery.

An examination of the tariff structure leads to the conclusion that Congress used the terms "machines" and "machinery" with different connotations. Paragraph 372 is a striking example. Not only do we find several "machines" specifically enumerated, but the same paragraph also enumerates printing machinery, bookbinding machinery, paper-box machinery, and textile machinery. Paragraph 1643 of the free list provides for certain machines and also for shoe machinery. It would seem to be a matter of common knowledge that shoe machinery, printing machinery, textile machinery, and pulp and paper machinery are of a kind which are large and cumbersome and are composed of a variety of machines and accessories properly integrated to make up what is indicated by the term "machinery." As was properly stated in plaintiff's brief—

* * * there is no such thing as one "machine" for making paper pulp or paper in the sense of a single machine designed or sold to perform all the functions necessary for the conversion of virgin or waste stock into paper pulp or paper. * * * The use of many and various separate machines in the pulp-making process, in which the Skardal may or may not play a part, was described by the expert witness for the plaintiff. * * * [referring to the testimony of the witness Nelson] As was brought out in the testimony * * * in the group of machines making paper pulp no particular machine can be more truly said to be a machine for making paper pulp than any other machine.

Further, the brief recites—

* * * Paper pulp is produced by a combination of different machines which are variously arranged and employed. * * *

It is those integrated machines and accessories which are undoubtedly contemplated by the provision for stock treating parts for pulp and paper machinery.

As stated by this court in *John V. Carr & Son, Inc.*, and *A. W. Fenton Co., Inc.* v. *United States*, 40 Cust. Ct. 292, C.D. 1996, wherein the question in issue was whether mechanisms for automatically feeding sheets of paper into printing presses should be classified as machines or as printing machinery in paragraph 372:

\* \* \* Implicit in the definition of machinery is an aggregate of means and appliances to accomplish an overall purpose, and every device which promotes that purpose is a part of the entire machinery.

The briefs of adversary parties invite consideration of the following four cases in which the provisions of paragraph 356 were involved:

*California Fruit Wrapping Mills (Inc.)* v. *United States* (1932), 19 C.C.P.A. (Customs) 381, T.D. 45513.

*E. Dillingham (Inc.)* v. *United States* (1930), 58 Treas. Dec. 329, T.D. 44281.

*E. Dillingham, Inc.* v. *United States* (1933), 63 Treas. Dec. 1510, Abstract 24027.

*American Voith Contact Co., Inc.* v. *United States* (1933), 64 Treas. Dec. 1070, Abstract 25958.

The *California* case, *supra*, concerned the classification of what are known as Fourdrinier-wire screens. It appears from the opinion, in that case, that said screens are endless and travel on rollers and are used to carry the prepared paper stock, in film form, from its receptacle, known as the head box, "\* \* \* to the felt, which in turn passes it between the rollers of the paper machine for several squeezings."

The court was of the opinion that the words "stock-treating parts" in paragraph 356 of the Tariff Act of 1922, which is in identical terms with said paragraph in the act of 1930, had reference to the treatment of paper and pulp material before it reached the stage of entering upon the wire screens and was related to parts "\* \* \* which perform, or assist in performing, the functions of cutting, grinding, beating, or similar functions." In conclusion, the court held that the Fourdrinier-wire screens did not perform such functions and, inasmuch as they served to manufacture paper from finished stock, they could not properly be held to be "stock-treating parts for pulp and paper machinery."

In the course of its opinion, the court stated—

We agree with the lower court that the screens here involved are not *ejusdem generis* with the articles designated in said paragraph 356. \* \* \*

It is of interest here to recall what the lower court said with reference to the rule of *ejusdem generis* in the *California* case.

A reading of the opinion of the lower court (59 Treas. Dec. 981, T.D. 44841) discloses that the court there referred to *ejusdem generis* only after it had found that the function of the Fourdrinier-wire screen pertained to the manufacture or conversion of finished stock

into either pulpboard or paper and that the elimination of water from the finished stock by the Fourdrinier-wire screen could not "in any sense be considered a further treatment of the [raw] stock itself." The court thus concluded that the Fourdrinier-wire screen was not a stock treating part. It is clear, therefore, that the trial court did not apply the rule of *ejusdem generis* in order to arrive at its determination of the case, and such references which were made to the rule would seem to be in the nature of *dicta*.

The first *Dillingham* case, *supra*, involved the classification of certain cast-iron grinders which were used to convert woodstock into woodpulp through a grinding process and were held to be properly classifiable as "stock-treating parts for pulp and paper machinery" in paragraph 356 of the Tariff Act of 1922.

The second *Dillingham* case, above referred to, related to a machine known as a "K.W.M. Refiner" which the opinion stated was used to "* * * regrind and refine pulp stock which has passed through the ordinary grinders but which is too coarse to pass through the screens for paper making, and that after passing through the refiner the stock is returned to the 'bull screen' which is the first stage of the paper-making process." The claim of plaintiff therein that said machine should be classified within the provision of paragraph 356 of the Tariff Act of 1922 as "all other stock-treating parts for pulp and paper machinery" was sustained, citing both the *Dillingham* and *California* cases, *supra*.

In the *American Voith* case, *supra*, the published abstract decision indicates that certain machines equipped with knives which "cut up, tear, and mascerate paper mixed with water, reducing it to pulp," were classifiable as "stock-treating parts for pulp and paper machinery" in paragraph 356 of the Tariff Act of 1930. The *California* case was cited and followed.

It is significant that all of the four cases above cited were decided prior to the proclamation of the Torquay protocol, *supra*, wherein paragraph 372 was modified so as to provide for "machines for making paper pulp or paper." Knowledge of those decisions and their import must be imputed to the negotiators at the time the trade agreement was drafted and made effective.

The fact that the Skardal stock preparator "is an integrated mechanical complex" consisting of "a series of three perforated cylinders against each of which the stock is ground or beaten by three perforated shoes" clearly brings it within the principle of the second of the *Dillingham* cases relating to the "K.W.M. Refiner" as "stock-treating parts for pulp and paper machinery." The mere fact that the Skardal stock preparator may be a machine in itself would seem to be

of no consequence, in view of the broad meaning we have ascribed to the word "parts" in the provision for stock treating parts for pulp and paper machinery in paragraph 356.

Upon the facts of record and for the reasons stated, we find and hold that the Skardal stock preparator was properly classified within the provision for "stock-treating parts for pulp and paper machinery" in said paragraph 356.

The court is of the opinion that the word "parts," as used in the phrase "stock-treating parts for pulp and paper machinery" in paragraph 356 includes not only the Skardal stock preparator but also the other accessories in controversy, there being no proof to the contrary.

The protest is, therefore, overruled and judgment will issue accordingly.

DISSENTING OPINION

Rao, Judge: I regret that I am unable to concur in the conclusions reached by my associates in this case, based upon my analysis of the record and in view of the considerations hereinbelow expressed.

Plaintiff is the importer of a certain device known as a Skardal stock preparator and various parts thereof, which are used in the process of making paper pulp. It herein protests the action of the collector of customs at the port of entry in classifying said merchandise as stock treating parts for pulp and paper machinery and assessing duty thereon at the respective ad valorem rates prevailing on the dates of entry of the several shipments, to wit, 20 per centum, 19 per centum, 18 per centum, or 17 per centum, as provided in paragraph 356 of the Tariff Act of 1930, or as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

It is the claim of the plaintiff that, with certain exceptions hereinafter more particularly specified, said merchandise is properly provided for in paragraph 372 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, or by said sixth protocol, as machines for making paper pulp, and parts thereof, which are dutiable, depending upon the date of entry, at the rate of 10 per centum ad valorem, or 9½ per centum ad valorem, or 9 per centum ad valorem, or 8½ per centum ad valorem.

These several provisions, insofar as here pertinent, read as follows:
Paragraph 356 of the Tariff Act of 1930:

Planing-machine knives, tannery and leather knives, tobacco knives, paper and pulp mill knives, roll bars, bed plates, and all other stock-treating parts for pulp and paper machinery, shear blades, circular cloth cutters, circular cork cutters, circular cigarette cutters, meat-shearing cutters, and all other cutting knives and blades used in power or hand machines, 20 per centum ad valorem.

Paragraph 356, as modified by T.D. 54108, *supra:*

Roll bars, bed plates, and all other
  stock-treating parts for pulp and
  paper machinery (not including
  paper or pulp mill knives)_____ 19% ad val.    18% ad val.    17% ad val.

Paragraph 372, as modified by T.D. 52739, *supra:*

Machines, finished or unfinished, not specially provided for:
  *      *      *      *      *      *      *
    Machines for making paper pulp or paper_____ 10% ad val.
  *      *      *      *      *      *      *
Parts, not specially provided for, wholly or in chief value of metal or porcelain,
  of any article provided for in any item 372 in this Part:
  *      *      *      *      *      *      *
    Other_____ The rate for the
                                                            article of which
                                                            they are parts.

Paragraph 372, as modified by T.D. 54108, *supra:*

Machines, finished or unfinished, not specially provided for:
  *      *      *      *      *      *      *
    * * *; machines for making
      paper or paper pulp_____ 9½% ad val.    9% ad val.    8½% ad val.
  *      *      *      *      *      *      *
Parts, not specially provided for, wholly or in chief value of
  metal or porcelain, of any article provided for in any item
  372 in this Part.                               The rate for the
                                                  article of which
                                                  they are parts.

The parties have stipulated that the Skardal stock preparator, "is an integrated mechanical complex lacking only motive power from an outside source in order to perform the function for which it is designed, namely, the refining of paper slurry from virgin stock, waste paper, etc., by means of a grinding or grating action."

The stipulation also provides, in part, that—

Generally speaking, the machine consists of a series of three perforated cylinders against each of which the stock is ground or beaten by three perforated shoes. The other parts are the base, housing, inlet and exhaust ports, shaft, spiders to which the shoes are connected, sheave for belt for transmission of power from an outside source, and miscellaneous smaller parts.

It further appears from the stipulation, the testimony of two well-qualified witnesses called by plaintiff, and by diagrammatic representations of the pulp making process, known as flow sheets, that paper stock, which has not been sufficiently broken down in the initial beating and digesting steps and, hence, is too coarse to pass through a screen separator, is pumped through pipes into the Skardal stock preparator for further refinement.

The machine functions as follows: The stock enters through the inlet port into the first stage where it is beaten and ground between the rotating shoes

and inner surface of the stationary cylinder until it has been sufficiently refined to pass through the perforations in the cylinder. * * * It then flows into the second stage where the same process is repeated, the slurry becoming further beaten and ground and thus refined. It then passes through the perforations in the second cylinder into the third stage and after further beating and grinding leaves the machine through the perforations in the third cylinder and then the exhaust port. The function performed by the machine is the refinement of the stock fed to the machine, the process involved being that of making the fibres of the paper slurry shorter and finer by beating and grinding.

When the stock leaves the Skardal stock preparator, it is returned to the pulp making system for screening and thickening until it reaches the proper consistency for paper making. The Skardal stock preparator is but one of many pieces of machinery employed in the process of making paper pulp, there being no single device in any papermill capable of completely manufacturing paper pulp. It is not physically connected with other machines, for the performance of its function, except for the piping through which the slurry flows, and the motive power necessary for its operation. It is a separate and distinct unit for mechanically reducing the size of the individual pieces of stock in the slurry.

Other refiners may be substituted for the Skardal stock preparator, or none at all need be used, if the slurry is fine enough for the desired end result. It is also possible to supplant any one of the machines in the pulpmill with another of like character. However, a refiner, such as or similar to the Skardal stock preparator, is ordinarily considered to be essential to the proper and efficient production of paper pulp; and is a part of the mill equipment.

Counsel for the plaintiff concedes that the shoes, invoiced as Slapas, and the cylinders, invoiced as Malrings, where separately imported, are, in fact, stock treating parts for pulp and paper machinery, for they are the elements of the preparator between which the stock is beaten and ground. In addition, with respect to entry 22483, no objection is raised against the classification of the spiders (Rotornavs) as stock treating parts, for the reason that they were imported with shoes and cylinders, invoiced as one set of stators and rotors, and "the main value of the set lies in the shoes and cylinders, rather than in the spiders."

As to all other items, it is the contention of the importer that they are properly provided for in paragraph 372, as modified, *supra*, as machines for making paper pulp or parts thereof. In general, it is the position of the plaintiff that while, in the very broadest sense, the Skardal stock preparator may be referred to as a part of the machinery of a pulp making establishment, it is, in itself, a complete, independently functioning mechanism, which does not appropriately belong within a "parts" designation. It is further contended that the Skardal preparator is not *ejusdem generis* with any other items speci-

fied by name in said paragraph 356 and, hence, is not, within the intendment of the provision, a stock treating part *for* pulp and paper machinery.

Counsel for the Government urges that a Skardal stock preparator is only a part of the machinery for making paper and pulp, not a single, integrated mechanical device, which, by itself, produces paper pulp. As such, and since it treats the stock by cutting, grinding, beating, or a similar operation, counsel argues it is literally a stock treating part for pulp and paper machinery.

Before the specific issue created by these conflicting contentions can be resolved, certain preliminary observations relating to the scope and effect of the provision for machines for making paper pulp in paragraph 372 of the Tariff Act of 1930, as modified, *supra*, need to be made.

It appears that an *eo nomine* designation for machines for making paper pulp and paper was carved out of the provision for machines, not specially provided for, by trade agreement negotiation. The first such provision was written into the trade agreement with Sweden, 68 Treas. Dec. 19, T.D. 47785, in 1935. An explanation of the purport of the new language is to be found in the "Digest of Trade Data with Respect to Products on which Concessions were Granted by the United States in the United States–Swedish Trade Agreement," a document having acknowledged value in interpreting changes in phraseology effected by said agreement. *Border Brokerage Co.* v. *United States*, 44 Cust. Ct. 124, C.D. 2165, affirmed, 48 C.C.P.A. (Customs) 113, C.A.D. 774. The following statement relative to the new provision appears on page 162:

> The above classification is intended to include machines used (1) in the preparation of wood, rags, and other fibrous material for conversion into pulp, (2) in conversion of the prepared material into pulp, (3) in refining or packaging such pulp preliminary to its use in making paper, and (4) in the manufacture of such pulp into paper. The classification does not include sawmill machines such as slashers, log conveyors, etc., and other machines which though used in pulp mills have a more general use in the lumber and wood-using industries.

> Machines used in pulp mills include barkers, chippers, grinders, chip crushers, and screens for preparing the wood, or cutters, dusters, etc., for preparing rags, screens, refiners, presses, dryers, beaters, etc. The three types of machines commonly used for the conversion of pulp into paper are the Fourdrinier, cylinder, and Yankee.

A similar analysis of this provision is also to be found in the 1948 Summaries of Tariff Information, volume 3, part 4, page 154.

The foregoing statement lends support to the proof adduced by plaintiff, if indeed it be beyond the purview of this court to judicially notice the fact, that the manufacture of paper pulp is the combined contribution of a large number and considerable variety of individual machines. Some prepare the initial materials, others process and

treat stock, still others convert pulp into finished paper. Consequently, when the provision for machines for making paper and pulp was written into the trade agreement, it must have been its purpose to embrace more than just a single machine for making paper pulp and a single machine for making paper. If then, the intent of the negotiators of this provision was to include several different kinds of machines which, together, produce paper pulp, the major premise of the defendant's position is seemingly undermined. Chippers, grinders, refiners, and beaters are stock treating elements which are parts of the pulp making process. Yet, they appear to have been the very machines for making paper and pulp accorded separate tariff status by the new language and, hence, are not the stock treating parts provided for in paragraph 356.

On the other hand, if machines which treat stock in the course of the preparation of paper pulp were, prior to the adoption of the Swedish Trade Agreement, more specifically provided for in paragraph 356, as stock treating parts for pulp and paper machinery, it was beyond the province of the negotiators to make provision for them elsewhere. *Abercrombie & Fitch Co.* v. *United States*, 9 Cust. Ct. 336, C.D. 709, citing *United States* v. *Canadian National Railways*, 29 C.C.P.A. (Customs) 272, C.A.D. 202. See also, in this connection, *Atalanta Trading Corp.* v. *United States*, 42 C.C.P.A. (Customs) 90, C.A.D. 577.

It remains to be determined whether complete machines performing independent steps in the manufacture of paper pulp fall within the scope of the provision for stock treating parts for pulp and paper machinery. This question has been touched upon in certain prior decisions of this and our appellate court which have been brought to our attention in the excellent briefs submitted by adversary counsel.

In *E. Dillingham (Inc.)* v. *United States*, 58 Treas. Dec. 329, T.D. 44281, the merchandise in issue consisted of cast-iron grinders, each of which, when combined with an integral and essential part known as a pulp stone, was used to convert wood stock into woodpulp by a grinding process. In holding that the provision for "stock-treating parts for pulp and paper machinery" more specifically provided for the subject grinders than the provision for parts of machines, not specially provided for, the court observed that paragraph 356 of the Tariff Act of 1922, the same for all essential purposes as paragraph 356 of the 1930 act, was new legislation and that, before enacting it, Congress was supplied with the following information from the United States Tariff Commission in the 1921 Summary of Tariff Information, page 471:

\* \* \* Paper and pulp-mill knives are made of a straight piece of steel and used on "roll" or "fly" bars of beater engines, and on chippers and cutters. Slitter knives are of circular form and used in paper machines for slitting, or

cutting the paper lengthwise. A roll bar is a metal cylinder about 4 or 5 feet in diameter with heavy knives parallel with the shaft fitted into its face. A bedplate is a series of steel plates standing' on edge and bolted together. The "stock," or rough paper material, passes between the revolving "roll bar" and the stationary "bedplate" to be cut up. * * *

This case is of interest in providing the background for the provision for "stock-treating parts for pulp and paper machinery" but not, in my opinion, decisive of the issue here, since the grinders under consideration were actually parts of a unit.

*California Fruit Wrapping Mills (Inc.)* v. *United States*, 59 Treas. Dec. 981, affirmed 19 C.C.P.A. (Customs) 381, T.D. 45513, involved certain imported Fourdrinier-wire screens, conceded to be indispensable parts of paper making machines, which serve as the conveyors of pulp from the stock receptacle to the rollers of the paper machines, and are the means through which much of the water in the pulp material drains off. Plaintiff therein, contending for classification of its merchandise within the provision for stock treating parts for paper machinery, urged that water drainage was a stock treating process within the meaning of the language of paragraph 356. A majority of the court held to the contrary, being of opinion that when stock reaches the receptacle or head box from which Fourdrinier screens are fed, it has been fully treated and finished as stock and, thereafter, enters a new stage for conversion into a product which is something other than stock and, hence, Fourdrinier screens are not stock treating parts. The court further remarked upon the fact that paragraph 356 provides for stock treating parts *for* not *of* pulp and paper machinery and observed that Fourdrinier-wire screens were not *ejusdem generis* with the knives and cutters specified in the provision, stating:

* * * The articles intended are clearly those which grind, cut, beat, or similarly function in the actual preparation and treating of the stock as such.

In affirming said decision, our appellate court had this to say:

We do not think that the legislative intent in the use of the words "stock-treating parts for pulp and paper machinery" is so apparent as to exclude consideration of the doctrine of *ejusdem generis* or other applicable rules of construction.

We agree with the lower court that the screens here involved are not *ejusdem generis* with the articles designated in said paragraph 356. The articles named in the paragraph are those which cut, grind, or beat material, or assist in performing those functions. It is established that the screens * * * neither perform nor assist in performing such functions.

*     *     *     *     *     *     *

As heretofore indicated, we think that the words "stock-treating parts," as used in said paragraph 356, refer to the treatment of paper and pulp material before it has reached the stage of going upon the wire screens here involved,

and refer to *parts* which perform, or assist in performing, the functions of cutting, grinding, beating, or similar functions. [Last italics supplied.]

Citing the *Dillingham* and *California Fruit Wrapping Mills* (*Inc.*) cases, *supra*, as authorities, this court subsequently held, in *E. Dillingham, Inc.* v. *United States*, 63 Treas. Dec. 1510, Abstract 24027, and *American Voith Contact Co., Inc.* v. *United States*, 64 Treas. Dec. 1070, Abstract 25958, that, respectively, a paper stock refining machine, which grinds and refines pulp stock too coarse to pass through paper making screens, and a pulping machine, equipped with knives to cut up paper mixed with water, and reduce it to pulp, were properly classifiable, as claimed, in paragraph 356, as all other stock treating parts for pulp and paper machinery.

The decisions in the cases last cited are reported in brief and do not clearly reveal the rationale behind the conclusions reached. Accordingly, I have examined the official papers constituting the records thereof for further elucidation. The full opinion in the second *Dillingham* case adds little to the information supplied in the abstract, except that this court held, as a matter of law, that the involved refiner was a stock treating part for pulp and paper machinery, and it does not appear that the contention advanced by the plaintiff, in the instant case, was submitted for consideration.

In *America Voith Contact Co., Inc.* v. *United States*, *supra*, although counsel, in their briefs, adverted to the issue of whether a complete machine might appropriately be considered to be a part of machinery, the court did not discuss that phase of the case in its full opinion. It appears to have been primarily concerned with the question of whether the machine in issue performed the functions of cutting, grinding, beating, or similar operations, as prescribed in *California Fruit Wrapping Mills* (*Inc.*) v. *United States*, *supra*. Of course, it cannot be denied that, in holding the machine before it to be a stock treating part for pulp and paper machinery, the court implicitly sanctioned the principle that a machine may be a part within the intendment of paragraph 356, *supra*.

Whether the holding of the *California Fruit Wrapping Mills* (*Inc.*) case warranted such a conclusion, however, seems now a doubtful proposition. It must be remembered that the article before the court, in that case, was an item conceded to be an indispensable *part* of a paper making machine, not in itself a complete machine, and that, in discussing the words "stock-treating parts," the court specifically referred to "*parts* which perform, or assist in performing, the functions of cutting, grinding, beating, or similar functions." [Italics supplied.] Taken in context and in the light of the merchandise involved, it would seem that the court was speaking in terms of items which are constituent elements of a unit, rather than of a total entity.

Moreover, if the principle of *ejusdem generis* applies to the function of the articles *eo nomine* designated in said paragraph 356, I believe it likewise applies to the *character* of the enumerated articles. It is my view, based upon the information supplied to Congress when it first considered this provision, that such of the knives, cutters, blades, roll bars, and bedplates specified in the paragraph as serve as instruments for machinery, are in the nature of parts of machines in the conventional sense, not in and of themselves machines which are complete units.

This view is further fortified for me by the words which Congress employed to provide for other stock treating parts. The language reads "parts for," not "parts of," which is a most uncommon statutory expression for the designation of parts. More often than otherwise, whenever Congress has made provision for parts, it has used the preposition "of" either alone, as in the case of the many provisions for "parts *of* any of the foregoing," or in conjunction with the adverb "there," as in "parts *thereof*." Most particularly, paragraph 372 of the Tariff Act of 1930, which is the comprehensive provision for machines and machinery of many varieties, reads "parts * * * of any of the foregoing."

While the expression "parts of machinery" might well connote any appurtenance necessary to promote the overall purpose of an aggregate of means and appliances, and thus refer to complete units (*John V. Carr & Son, Inc., and A. W. Fenton Co., Inc.* v. *United States*, 40 Cust. Ct. 292, C.D. 1996, *Jett & Co.* v. *United States*, 56 Treas. Dec. 205, T.D. 43568), the expression "parts for machinery" is suggestive of a more limited meaning having reference to elements which do not function separately but are constituents of an entity.

For the foregoing reasons, I find merit in the position taken by the plaintiff, and would sustain its protest claims to the following extent:

All items invoiced as Skardal stock preparators and covered by entries 22483 and 10264 should be dutiable at the rate of 10 per centum ad valorem or at the rate of 9½ per centum ad valorem, depending upon the date of entry within the provision for machines for making paper pulp in paragraph 372, as modified, *supra*.

All items covered by entries 10859 and 5694, except those invoiced as Slapas (shoes) and Malrings (cylinders), should be dutiable at the rate of 9 per centum ad valorem or at the rate of 8½ per centum ad valorem, depending on the date of entry, in said paragraph 372, as modified, *supra*, as parts of machines for making paper pulp.

As to all other merchandise not hereinabove specified, all other claims should be overruled.